DISTRICT COURT, BOULDER COUNTY
STATE OF COLORADO
1777 6th Street
Boulder, Colorado 80302
(303) 441-3750

DATE FILED: March 12, 2024 9:58 AM
FILING ID: CA2EDD2F24808
CASE NUMBER: 2024CV30221

**Plaintiff:** TOWN OF SUPERIOR, a municipal corporation of the State of Colorado, and THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF BOULDER, COLORADO, a County government in the State of Colorado,

v.

**Defendants:** THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF JEFFERSON, COLORADO, as successors in interest to the Jefferson County Airport Authority, and DR. STEPHANIE CORBO in her official capacity as acting Airport Director of the Rocky Mountain Metropolitan Airport.

▲COURT USE ONLY▲

*Attorneys for Plaintiffs:*
Andrew Barr, #49644
Lindsay Aherne, #48391
John Wharton, #47776
GREENBERG TRAURIG, LLP
1144 15th Street, Suite 3300
Denver, Colorado 80202
(303) 572-6500
Andrew.Barr@gtlaw.com; AherneL@gtlaw.com;
John.Wharton@gtlaw.com

Case No.:

Division:

## COMPLAINT FOR INJUNCTIVE RELIEF

Plaintiffs Town of Superior (the "Town") and the Board of County Commissioners of the County of Boulder, Colorado ("Boulder County," collectively with the Town, "Plaintiffs"), by and through their undersigned attorneys at Greenberg Traurig, LLP, allege as follows:

## NATURE OF THE ACTION

1.      Plaintiffs bring this public nuisance lawsuit against the Board of County Commissioners of the County of Jefferson, Colorado, and Dr. Stephanie Corbo, the acting Airport Director of the Rocky Mountain Metropolitan Airport, (collectively, "Jefferson County")

for the substantial role that Jefferson County has played, and continues to play, in causing, contributing to, and otherwise creating an unreasonable injury to the Plaintiffs' residents' health, safety, and welfare.

2.      Plaintiffs bring this suit to protect a public right and to prevent future potential injury to the public at large, including their residents.

3.      Plaintiffs seek preliminary and permanent injunctions requiring Jefferson County to abate the public nuisance caused by piston-engine aircraft performing "touch and go" operations on Runway 30L and Runway 30R at Rocky Mountain Metropolitan Airport ("Airport"). These operations deposit unsafe levels of lead particulates on Plaintiffs and expose Plaintiffs' residents to repeated and excessive noise and thus create unreasonable health and safety hazards for their residents, constitute a public nuisance, and must be enjoined.

## PARTIES, JURISDICTION, AND VENUE

4.      The Town is a Colorado statutory municipal corporation with an address of 124 East Coal Creek Drive, Superior, Colorado 80027. The Town is located in Boulder County and Jefferson County.

5.      Boulder County, a subdivision of the State of Colorado, is a body corporate and politic empowered to sue and be sued. It has a principal office located at 1325 Pearl St., Boulder, Colorado 80302. Nearly all of the Town's residents are also residents of Boulder County.

6.      Defendant the Board of County Commissioners of the County of Jefferson, Colorado, has a principal office located at 100 Jefferson County Parkway, Golden, CO 80419, and is a successor in interest to the Jefferson County Airport Authority.

7.      Jefferson County is the owner, operator, and sponsor of the Airport, which has a physical address of 11755 Airport Way, Broomfield, CO 80021.

8.      Defendant Dr. Stephanie Corbo is the Chief Financial Officer of Jefferson County and is the acting Airport Director ("Airport Director"). Dr. Corbo has a principal office located at 100 Jefferson County Parkway, Golden, CO 80419. As Airport Director, Dr. Corbo has the authority to implement safety and operational rules at the Airport.

9.      Venue is proper in this Court pursuant to Colorado Rule of Civil Procedure 98 because the public nuisance caused by Jefferson County occurs in Boulder County, the subject matter of the action is located in Boulder County, Plaintiffs and their residents are harmed in Boulder County, and Plaintiffs are primarily located in Boulder County.

10.     Jefferson County is subject to personal jurisdiction in Colorado pursuant to C.R.S. § 13-1-124 because it is located in Colorado, it transacts business in Colorado, and has caused substantial injury to Plaintiffs' residents in Colorado. The Airport Director is subject to personal

jurisdiction in Colorado for the additional reason that the Airport Director is a natural person who resides in Colorado and is employed in Colorado.

## BACKGROUND AND GENERAL ALLEGATIONS

### The Town

11.     The Town lies in central Colorado on the eastern slopes of the Rocky Mountains in the Front Range.

12.     The Town is located immediately northwest of the Airport, with the Town's southern boundary less than one mile from where the Airport's property ends.

13.     The Town encompasses approximately four square miles and has thousands of private residences that house approximately 13,000 residents.

14.     The Town manages and maintains all Town-owned natural and developed open spaces, park areas, and athletic surfaces. The Town has approximately 630 acres of public parks, green space, and open space and approximately 35 miles of trails for its residents to use and enjoy. The Town's amenities also include 13 playgrounds, three multipurpose fields, three baseball/softball fields, two outdoor pools, four tennis courts, one skate park, and three basketball courts.

15.     Several daycares, preschools, and elementary schools are located in the Town.

16.     The Town has future development plans, including the construction of additional private residences and public outdoor spaces.

17.     As a governmental entity, the Town has the authority and responsibility to protect the public health, safety, and general welfare of its residents. The Town takes this responsibility seriously.

18.     The Town brings this suit to protect a public right—air and soil free from lead contaminants and the quiet enjoyment of each resident's property—to prevent future injury to its residents and the public at large.

### Boulder County

19.     The Town is primarily located in Boulder County and nearly all of the Town's residents are also residents of Boulder County.

20.     Boulder County is home to more than 300,000 residents, encompassing 753 square miles.  Land within Boulder County contains sub-alpine and alpine ecosystems and a shrinking glacier. Boulder County's west contains forests, slopes, mountain communities and canyons, which hold creeks that bring water to the cities, high plains, grasslands and farmlands of Boulder County's east.

21.    The Boulder County seat is the City of Boulder. Other incorporated towns and cities include: the Town, Erie, Jamestown, Lafayette, Longmont, Louisville, Lyons, Nederland, and Ward.

22.    Boulder County has long held a commitment to stewardship of the land, environment, and community. The eastern plains are rich in agricultural farmland, lakes and rolling pastures filled with distinctly defined cities and communities, while the foothills and mountains to the west feature prominent rock formations, forests and high-altitude valleys and sweeping vistas. Preserving Boulder County's future in a way that maintains its agricultural landscape, character and unique way of life is a top priority Boulder County residents.

23.    Boulder County owns or holds conservation easements over a substantial amount of real and other property for its own benefit and for that of its residents. This includes more than 100,000 acres of publicly owned "open space", *i.e.*, Boulder County owned public land and conservation easements preserved for recreation, conservation, and agricultural purposes. Boulder County has a duty to preserve and maintain this open space for future generations. Boulder County owns or co-owns a significant amount of open space near the Airport.

24.    As a governmental entity, Boulder County has the authority and responsibility to protect the public health, safety, and general welfare of its residents. Boulder County takes this responsibility seriously.

25.    Boulder County brings this suit to protect a public right—air and soil free from lead contaminants and the quiet enjoyment of each resident's property—to prevent future injury to its residents and the public at large.

**The Airport**

26.    The Airport is owned, operated, and located in Jefferson County. However, due to its location, as soon as aircraft depart to the north, they leave Jefferson County and enter the airspace of the Town and Boulder County.

27.    The Airport has two primary runways and one alternative, or "crosswind," runway. The crosswind runway is in the process of being decommissioned by Jefferson County.

28.    The Airport's primary runways are parallel and oriented 300° northwest and 120° southeast. These primary runways are called Runway 30L/12R and Runway 30R/12L.

29.    Runway 30L/12R is 7,002 feet long.

30.    Runway 30R/12L is 9,000 feet long.

31.    Due to prevailing wind patterns, a majority of operations at the Airport takeoff or land to the north and use Runway 30L or Runway 30R.

32.    An aircraft taking off on Runway 30L or Runway 30R will fly directly over the Town as soon as it flies beyond the end of the runway.

33.    Subject only to adverse weather, the Airport is open for nearly any type of aircraft to takeoff or land 24 hours a day, 365 days a year.

34.    In 2022, the Airport experienced 262,348 operations (an operation is a takeoff or a landing).  This is an average of 718 operations each day.

35.    In 2022, on average the Airport had at least one operation every two minutes *for the entire year* (24 hours a day, 365 days a year).

36.    In 2022, due to the seasonal trends of operations at the Airport, there were 801 operations per day in May – September, and 660 per day in October – April.

37.    During summer 2022 (May – September), the Airport experienced approximately 33 operations per hour, 24 hours per day. But due to the high percentage of training operations at the Airport, these flights were largely concentrated in the daylight hours.

38.    In 2023, the Airport experienced 281,806 operations. This is an average of 772 operations each day and a 7.4% increase in operations when compared to 2022.

39.    In 2023, on average the Airport had more than one operation every two minutes *for the entire year* (24 hours a day, 365 days a year).

40.    In 2023, due to the seasonal trends of operations at the Airport, there were 857 operations per day in May – September, and 711 per day in October – April.

41.    During summer 2023 (May – September), the Airport experienced approximately 36 operations per hour, 24 hours per day. But due to the high percentage of training operations at the Airport, these flights were largely concentrated in the daylight hours.

42.    An annual increase in operations is regularly experienced at the Airport. For example, in 1990, the Airport experienced 142,341 operations. In 2000, 172,460 operations occurred. In 2019 (pre-COVID), 191,533 operations occurred. And in 2023, 281,806 operations occurred.

43.    It is typical for the Airport to experience a 7% (or more) increase in operations year-over-year.

44.    On information and belief, Jefferson County expects that the Airport will continue to experience an increase in operations year-over-year.

45.    Moreover, Jefferson County is actively trying to build new infrastructure to facilitate more operations. For example, in 2023 Jefferson County petitioned the FAA for permission to add a new taxiway so that the Airport can build new hangars at the Airport. If

approved, Jefferson County has stated that an *additional* 34,944 operations could occur each year. This increase is in addition to the annual increase that would otherwise occur.

46.    Although the Airport is busy all year, it is especially busy during the summer.

47.    Because use of the Airport is skewed towards the summer, the Airport may experience more than 1,500 operations on any given summer day.

48.    Of the 2022 operations at the Airport, 249,063 are reported to be "general aviation," with 153,295 classified as "local general aviation."

49.    Of the 2023 operations at the Airport, 255,682 are reported to be "general aviation," with 155,178 classified as "local general aviation."

50.    As used in FAA Form 5010-1, "local general aviation" refers to "an operation within the airport traffic pattern or the aircraft is known to be from within 20 miles of the airport."

51.    It is not typical for an aircraft to have a final destination that is different than, but located within 20 miles of, its originating airport.

52.    Therefore, of the "local general aviation" operations at the Airport, an overwhelming majority represent "operations within the airport traffic pattern" by aircraft based at the Airport. These are largely "touch-and-go" operations performed by flight schools located at the Airport.

53.    In a recent application Jefferson County submitted to the FAA, "local general aviation flights" at the Airport were "presumed to be almost entirely training operations" performed by the flight schools based at the Airport.

54.    There are four flight schools located at the Airport and they utilize (or lease on an hourly basis) approximately 60 aircraft. Nearly all of these aircraft are piston-engine training aircraft.

55.    In its 2023 Adopted Budget, Jefferson County "estimated" that it would sell 5.5 million gallons of fuel in 2023. This amount will continue to increase as operations increase.

**Aircraft at the Airport**

56.    Most types of aircraft use fuel that does not contain lead.

57.    All jets and turboprops use fuel that does not contain lead.

58.    Fixed-wing aircraft with one or more piston engines, however, almost exclusively use "avgas" which contains lead ("piston-engine aircraft"). *See* Federal Aviation Administration, *Aviation Gasoline* (available at https://www.faa.gov/about/initiatives/avgas).

59.     As the FAA acknowledges, "avgas remains the only transportation fuel in the United States to contain lead."

60.     Many piston-engine aircraft are permitted to use sustainable aviation fuel ("SAF") instead of avgas, but on information and belief, nearly all of the piston-engine aircraft operating at the Airport use avgas (which is leaded).

61.     The FAA is hoping to eliminate avgas by 2030, largely because of the negative health impacts known to be caused by lead particulates contained in the exhaust of aircraft using avgas.

62.     Jefferson County has announced that it is attempting to fully transition from offering avgas to SAF by 2027. However, that announcement was made by the Airport's former airport director, and it is unclear whether this transition remains a priority. It is also unclear if Jefferson County will be able to stop offering avgas even if it is capable of fully transitioning to SAF in 2027.

63.     Generally, piston-engine aircraft operating at the Airport are small and used for flight training or recreational use.

64.     The National Academies of Sciences, Engineering, and Medicine ("National Academies") describes piston-engine aircraft as "the predominant aircraft used for personal and recreational flying, typically in the smallest, most basic airplanes."

65.     Most piston-engine aircraft operating at the Airport have four or fewer seats, are not pressurized, and travel at speeds less than (usually considerably less than) 200 miles per hour.

**Typical Takeoffs at the Airport**

66.     One of the most dangerous aspects of any flight occurs between takeoff and when the aircraft reaches approximately 500 feet above the ground.

67.     To mitigate risk, pilots are trained to takeoff and climb using pre-determined power settings, speeds, and maneuvers. This training teaches pilots how to climb as quickly and safely as possible until the aircraft reaches a safe maneuvering altitude.

68.     For this reason, in nearly all piston-engine aircraft, the takeoff and climb out sequence occurs with full engine power applied.

69.     Generally, piston-engine aircraft taking off at the Airport will stop short of the assigned runway on the taxiway until cleared to enter the runway. Then, when cleared, the piston-engine aircraft will taxi onto the end of the assigned runway. Finally, when cleared, the piston-engine aircraft will utilize full power and takeoff using the least amount of runway as

safely possible. For purposes of this Complaint, this type of takeoff is referred to as a "Typical Takeoff" (as opposed to a "touch-and-go," which is discussed *infra*).

70.     Because of prevailing winds and the Airport's configuration (*e.g.*, location of hangars), most piston-engine aircraft performing a Typical Takeoff at the Airport will be assigned to use Runway 30R.

71.     An aircraft taking off at the Airport using Runway 30R or Runway 30L will fly directly over the Town just seconds after it departs the Airport.

72.     A piston-engine aircraft performing a Typical Takeoff at the Airport generally needs less than one-third of the length of Runway 30R to get airborne.

73.     A piston-engine aircraft taking off at the Airport will fly straight ahead until it reaches at least 500 feet above the ground and clears the departure end of the runways (meaning the northernmost end of the runway if Runway 30L or Runway 30R is in use).

74.     Once a piston-engine aircraft reaches 500 feet above the ground, it may reduce its power, flight configurations may be adjusted, forward speed may increase, and the aircraft may turn towards its initial waypoint.

75.     When a piston-engine aircraft reduces power, its engine utilizes less fuel and creates less emissions.

76.     When a piston-engine aircraft reduces power, the noise associated with its overflight is lower when compared to the same aircraft at full power.

77.     When a piston-engine aircraft performs a Typical Takeoff, it overflies Plaintiffs' airspace only once before continuing on to its destination.

78.     Due to Plaintiffs' geographic proximity to the Airport, when an aircraft performing a Typical Takeoff enters airspace over the Town and Boulder County, the aircraft may be high enough to use a reduced power setting and/or travel faster when compared to its power setting and speed during initial climb out.

**Touch-and-Go Operations at the Airport**

79.     In contrast to a Typical Takeoff, pilots flying piston-engine aircraft may request permission to perform a "touch-and-go."

80.     The air traffic control tower is authorized to approve or deny the request to conduct a touch-and-go for a variety of safety or operational reasons, including if the Airport has made an operating rule that prohibits touch-and-go operations.

81.     If the tower is not operating at the time of the operation (*e.g.*, overnight), the pilot will announce that a touch-and-go will be performed. The pilot is permitted to make this decision assuming that touch-and-go operations are permitted at the Airport.

82.     During a touch-and-go operation, an aircraft lands and departs without stopping on or exiting the runway.

83.     Nearly all touch-and-go operations are performed by piston-engine aircraft conducting training flights.

84.     On information and belief, approximately 99% or more of touch-and-go operations at the Airport are performed by piston-engine aircraft.

85.     A touch-and-go operation requires the pilot of a piston-engine aircraft to complete all of the following: safely land the aircraft, recover the aircraft (*i.e.*, adjust flaps, trim, carburetor heat, and/or other settings from landing configuration to takeoff configuration), initiate a takeoff (*i.e.*, apply full power, rotate, etc.), and climb out straight ahead at the pre-defined speed until the aircraft reaches a safe maneuvering altitude.

86.     Typically, pilots engaged in touch-and-go operations conduct several touch-and-goes during a single flight.

87.     The result of piston-engine aircraft conducting touch-and-go operations on Runway 30L or Runway 30R is that the aircraft gets airborne closer to the departure end (northern end) of the runway when compared to the same aircraft completing a Typical Takeoff.

88.     When a piston-engine aircraft takes off closer to the departure end of Runway 30R or Runway 30L, it will overfly Plaintiffs at a lower altitude when compared to the same aircraft engaged in a Typical Takeoff.

89.     During these touch-and-go operations, when in Plaintiffs' airspace, the piston-engine aircraft are utilizing full power and flying at low speeds in order that they may climb as quickly as possible.

90.     This combination of low altitude, low speed, and maximum power creates maximum lead and noise exposure for an extended time over Plaintiffs' residents.

91.     When a piston-engine aircraft creates maximum exhaust for an extended time over Plaintiffs, these aircraft unreasonably expose Plaintiffs' residents to hazardous lead-based particulates.

92.     If an aircraft overflies Plaintiffs' residents at higher altitudes, higher speeds, and lower power settings, the lead-based particulates are more diffuse and less hazardous to Plaintiffs' residents.

93.     If an aircraft overflies Plaintiffs' residents at higher altitudes, higher speeds, and lower power settings, the noise impacts are more diffuse and less hazardous to Plaintiffs' residents.

94.     Because of the nature of touch-and-go operations, the same aircraft will overfly Plaintiffs' residents several times during a single flight, leading to additional and unreasonable exposure to lead particulates and noise.

95.     During days with high density altitude at the Airport—which is very common during the summer—the unreasonable exposure to lead-based particulates and noise is exacerbated due to the impaired performance of piston-engine aircraft.

**Lead Pollution Caused by Piston-Engine Aircraft**

96.     The FAA recognizes the need to "eliminate lead and its potential harmful effects from fuel for piston-engine aircraft."

97.     The Centers for Disease Control and Prevention has concluded that there is no known safe level of lead in blood.

98.     Because of the susceptibility of children's developing nervous systems, exposure to even low concentrations of lead, including prenatal exposure, has been linked to decreased cognitive performance.

99.     The FAA Reauthorization Act of 2018 required the Secretary for the Department of Transportation to commission the National Academies to issue a report regarding avgas.

100.    In 2021, the National Academies issued their report. (National Academies of Sciences, Engineering, and Medicine. 2021. *Options for Reducing Lead Emissions from Piston-Engine Aircraft*. Washington, DC: The National Academies Press. *available at* https://doi.org/10.17226/26050.)

101.    In the report, the National Academies urge the FAA, airport sponsors (like Jefferson County), and the general-aviation industry to reduce lead emissions from piston-engine aircraft as soon as possible. The National Academies stated that "ample evidence and knowledge exist about the harm caused by lead pollution to highlight the need to initiate a comprehensive set of aviation lead mitigations *now*."

102.    The National Academies noted that avgas has been "the country's primary source of lead emissions" since 1996, when lead additives in automotive gasoline were banned.

103.    The National Academies stated that "because lead does not appear to exhibit a minimum concentration in blood below which there are no health effects"—meaning that any level of exposure is detrimental to one's health—"there is a compelling reason to reduce or eliminate aviation lead emissions and sources of exposure."

104.    The National Academies continues: "Airborne lead, which is usually in the form of particulate matter, can be inhaled by people in communities surrounding airports. In addition, particles containing lead can deposit onto soil and other surfaces and be ingested through activities, such as hand-to-mouth contact with surfaces where the particles have deposited. Deposited lead can also be resuspended into the air as dust and inhaled. Therefore, past emissions from piston-engine aircraft that deposited into soil and other surfaces can contribute to present-day lead exposures within and near airports."

105.    The National Academies recognized that piston-engine aircraft utilizing full power generate the most exhaust which "can create geographic areas with higher lead concentrations."

106.    The National Academies recognized that piston-engine aircraft can create especially large emissions during touch-and-go operations, even when compared to other phases of piston-engine aircraft flight. For example, at Centennial Airport (located just south of Denver), an estimated 29% of lead pollution at the airport is directly tied to piston-engine aircraft performing touch-and-go operations.

107.    The National Academies recommended that, in order to protect "public health, safety, and the environment" at or near airports, airport sponsors and other stakeholders should coordinate "efforts to reduce lead pollution and exposures at airports." This includes the "need to account for … the geographic distribution of lead emissions at the airport."

108.    The National Academies concluded that "[t]here are no known safe lead exposures" and "lead's adverse effects on human health, and particularly on the development of children, are well established. While the elimination of lead pollution has been a U.S. public policy goal for decades, the [general aviation] sector continues to be a major source of lead emissions."

109.    The U.S. Environmental Protection Agency ("EPA") announced a final determination on October 18, 2023, that "emissions of lead from aircraft that operate on leaded fuel cause or contribute to air pollution which may reasonably be anticipated to endanger public health and welfare."

110.    The EPA stated that "[a]ircraft that use leaded fuel are the dominant source of lead emissions in our air" and "[t]he science is clear: exposure to lead can cause irreversible and life-long health effects in children."

111.    The EPA also stated that "[l]ead emissions from aircraft are an important and urgent public health issue. Protecting children's health and reducing lead exposure are two of EPA's top priorities. Lead exposure can have harmful effects on cognitive function, including reduced IQ, decreased academic performance, as well as increased risk for additional health concerns. ***There is no evidence of a threshold below which there are no harmful effects on cognition from lead exposure***."

112.    Given how many piston-engine aircraft operations overfly Plaintiffs' residents, Jefferson County knows, or should know, that lead particulates in piston-engine aircraft emissions stemming from operations at the Airport pose an unreasonable hazard to Plaintiffs' residents.

113.    Given how many piston-engine aircraft operations overfly Plaintiffs' residents, Jefferson County knows, or should know, that lead particulates stemming from operations at the Airport are more concentrated over Plaintiffs when a piston-engine aircraft is utilizing full power.

114.    Given how many piston-engine aircraft operations overfly Plaintiffs' residents, Jefferson County knows, or should know, that lead particulates stemming from operations at the Airport are more concentrated over Plaintiffs when a piston-engine aircraft is flying slowly.

115.    Given how many piston-engine aircraft operations overfly Plaintiffs' residents, Jefferson County knows, or should know, that lead particulates stemming from operations at the Airport are more concentrated over Plaintiffs when a piston-engine aircraft is flying at low altitudes.

116.    Given how many piston-engine aircraft operations overfly Plaintiffs' residents, Jefferson County knows, or should know, that piston-engine aircraft performing touch-and-go operations on Runway 30L or Runway 30R expose Plaintiffs' residents to increased and unreasonable levels of lead particulates when compared to any other flight operation at the Airport.

117.    Given how many piston-engine aircraft operations overfly Plaintiffs' residents, Jefferson County knows, or should know, that it can stop exposing Plaintiffs' residents to these unreasonable levels of lead particulates by prohibiting piston-engine aircraft from performing touch-and-go operations on Runway 30L or Runway 30R.

**Lead Pollution Caused by Piston-Engine Aircraft Performing Touch-and-Go Operations at the Airport**

118.    Operations conducted by piston-engine aircraft utilizing Runway 30L or Runway 30R, especially touch-and-go operations, expose Plaintiffs' residents to lead particulates, raising health and safety concerns and unreasonably interfering with the residents' use and enjoyment of Plaintiffs' property and their own property.

119.    The Town conducted preliminary tests of airborne lead levels in the Town in 2023. The Town will continue to test lead levels in the future.

120.    Based on the 2023 tests, Plaintiffs believe that their airborne lead levels are directly impacted by piston-engine aircraft overflights stemming from piston-engine aircraft operations at the Airport.

121.    For example, on a day in which the Airport experienced approximately 1,400 operations, the Town's airborne lead levels appear to be significantly higher than measurements that had been taken in the Town on a day with little to no overflight activity.

122.    Plaintiffs are not aware of any source of airborne lead in the Town other than emissions from piston-engine aircraft overflying the Town.

123.    Meaningfully reducing the number of overflights performed by piston-engine aircraft would mitigate some or all of the unreasonable health concerns caused by airborne lead exposure.

124.    Plaintiffs' residents, especially children, are put at risk by the deposit of lead particulates from piston-engine aircraft overflights.

125.    On information and belief, touch-and-go operations deposit materially more lead particulates in the Town and Boulder County when compared to piston-engine aircraft performing Typical Takeoffs because piston-engine aircraft performing touch-and-go operations will overfly Plaintiffs several times an hour and piston-engine aircraft performing Typical Takeoffs are higher, faster, may be at reduced power settings, and will depart the immediate vicinity of the Airport after a single overflight.

126.    The increased exposure of lead emissions from touch-and-go operations performed by piston-engine aircraft threatens Plaintiffs' residents and poses an unreasonable risk to their residents' health, safety, and welfare.

### Noise Pollution and Negative Health Effects Caused by Aircraft Noise

127.    Lead pollution is not the only unreasonable injury created by piston-engine aircraft conducting touch-and-go operations on Runway 30L or Runway 30R.

128.    It is well-established that aircraft noise has serious impacts on human health.

129.    Several studies demonstrate a higher prevalence of cardiovascular disease and medication intake in persons exposed to serial aircraft noise.

130.    Other studies uncovered an increased risk of stroke and coronary heart disease among those exposed to more aircraft noise than others.

131.    Researchers have concluded that noise not only causes annoyance, sleep disturbance, and reductions in quality of life, but also contributes to a higher prevalence of the most important cardiovascular risk factor arterial hypertension and the incidence of cardiovascular diseases.

132.    Studies also show that nighttime aircraft noise disturbs and fragments sleep, leads to changes in sleep structure, increases sleepiness during the following day, and leads to

impairments of cognitive performance. This sleep disruption affects cardiovascular health and, with long term exposure, may predispose individuals to the development of hypertension and cardiovascular disease.

133.    To remedy these avoidable health effects, researchers recommend that airport sponsors (like Jefferson County) employ noise mitigation strategies for takeoff and landing procedures. This includes reducing or eliminating exposure to unreasonable sound events.

134.    The World Health Organization ("WHO") has made clear that "[e]nvironmental noise is an important public health issue, featuring among the top environmental risks to health." The WHO specifically referenced aircraft noise when making this warning.

135.    The WHO recommended several policies to ensure individuals are not exposed to undue risk from aircraft noise: reducing population exposure to noise levels produced by aircraft (1) below 45 dB during the day and (2) below 40 dB at night.

136.    According to the WHO, decibel levels above 45dB/40dB are associated with adverse health effects and have adverse effects on sleep.

137.    WHO thus "strongly recommends that policymakers implement suitable measures to reduce noise exposure from aircraft in the population exposed to levels above the guideline values for average and night noise exposure."

138.    Serial exposure to aircraft noise can even increase the chance of death.

**Noise Pollution Caused by Piston-Engine Aircraft Performing Touch-and-Go Operations at the Airport**

139.    Touch-and-go operations conducted by piston-engine aircraft utilizing Runway 30L or Runway 30R expose Plaintiffs' residents to unreasonable noise, raising serious health and safety concerns and unreasonably interfering with the residents' use and enjoyment of Plaintiffs' property and their own property.

140.    Noise generated by piston-engine aircraft performing touch-and-go operations is at its maximum during the summer season because (a) more operations occur and (b) piston-engine aircraft performance is reduced during hot temperatures and/or days with a high-density altitude. Hot temperatures and high density-altitude conditions are uncommon in the winter, spring, and fall; both conditions are common in the summer, especially in the afternoon.

141.    As Jefferson County recognizes in its most recent RMMA Strategic Business Plan, decibels on an "A-weighted scale," or dBa, which is the FAA's accepted measurement to consider aircraft noise, are measured on a logarithmic scale. This means that an increase in 10 decibels is equivalent to a tenfold increase in sound energy, and an increase in 20 decibels is equivalent to 100x sound energy, etc.

142.    Data collected by the Town shows that an average touch-and-go operation by a piston-engine aircraft can expose the Town's residents to an approximately 20 dBa or more increase in noise levels when compared to ambient noise levels in the Town. This means that the overflight is 100x louder than ambient noise levels.

143.    Some piston-engine touch-and-go operations meet or exceed 70 dBa over the Town. This can be *more than 1,000 times louder* than ambient.

144.    This noise exposure is directly caused by piston-engine aircraft performing touch-and-go operations at the Airport.

145.    This noise exposure is creating unreasonable health impacts on the Plaintiffs' residents.

146.    The Town's residents, especially at night, are put at risk by the noise exposure from piston-engine aircraft overflights.

147.    The noise levels are so excessive that in 2023 a Colorado state appellate court affirmed a Colorado state district court order that vacated several avigation easements that Plaintiffs' residents had entered into with Jefferson County for the benefit of the Airport. The basis for the court vacating several easements was increased noise impacts caused by the Airport.

148.    As a result of the 2023 court ruling that vacated several easements, on information and belief, tens of thousands of operations (or more) at the Airport constitute a trespass of Plaintiffs' property and Plaintiffs' residents' property.

149.    On information and belief, touch-and-go operations create a materially larger noise impact on Plaintiffs' residents when compared to piston-engine aircraft performing Typical Takeoffs because piston-engine aircraft performing touch-and-go operations will overfly Plaintiffs' residents several times an hour and piston-engine aircraft performing Typical Takeoffs are higher, faster, may be at reduced power settings, and will depart the immediate vicinity of the Airport after a single overflight.

**Jefferson County Is Causing Unreasonable Injury**

150.    Plaintiffs have taken, and are taking, all reasonable and necessary measures to address and abate these unreasonable injuries within their jurisdictions.

151.    Plaintiffs have asked Jefferson County, several times, to abate this nuisance by limiting or eliminating touch-and-go operations and their associated noise and pollution.

152.    For example, Plaintiffs were instrumental in forming a "Community Noise Roundtable" at the Airport. (https://www.jeffco.us/4109/Noise-Roundtable.) The stated purpose of the Noise Roundtable "is to provide for and promote a regional, coordinated approach to

collaborate on and address the noise impacts to the community surrounding the Rocky Mountain Metropolitan Airport" and to consider "operational changes … for associated noise impacts."

153.    Despite the Noise Roundtable being in existence for several years, no meaningful changes have occurred at the Airport.

154.    It recently became known that Jefferson County was not participating in the Noise Roundtable in good faith.

155.    For example, on information and belief, Jefferson County's former airport director stated that the Noise Roundtable was "useless" and a "waste of money." He continued: "I want [several communities, including Plaintiffs] to waste their money and time" with the Noise Roundtable; "nothing gets done, it just makes people feel happy that they're part of the Roundtable and they get to bitch" while wasting "a couple hundred thousand dollars of taxpayer's money."

156.    It is thus no surprise that the Noise Roundtable has been unable to garner any traction with Jefferson County and has led to no "operational changes … for associated noise impacts."

157.    The former airport director also stated that Jefferson County "do[es] not have to worry about" lead impacts on children near the Airport because the affected communities "can't prove that it's coming from the airport."

158.    It is thus no surprise that Plaintiffs' (and the State's) concerns regarding the hazards of lead-particulate emissions have gone unaddressed by Jefferson County.

159.    The Town has explained to Jefferson County that Jefferson County has the authority to create and enforce an operating rule at the Airport that prohibits unsafe or inefficient operations.

160.    Jefferson County has the ability to abate the public nuisance by prohibiting touch-and-go operations by piston-engine aircraft on Runway 30R or Runway 30L.

161.    No federal law or regulation prevents Jefferson County from implementing an Airport operating rule that prohibits touch-and-go operations by piston-engine aircraft.

162.    No state law or regulation prevents Jefferson County from implementing an Airport operating rule that prohibits touch-and-go operations by piston-engine aircraft.

163.    Jefferson County has an obligation to protect and maintain safe operations at the Airport. This includes protecting the public health and safety of the local community that is located within the Airport's operating area.

164.    The Town, including portions located within Boulder County, is located within the Airport's operating area.

165.    The Town, including portions located within Boulder County, is located within the Airport's designated Class D airspace and is located within the runway protection zone for both Runway 30L and Runway 30R.

166.    The Town, including portions located within Boulder County, is located within the highest noise corridors reflected in the Airport's most recent Master Plan (which itself is outdated and underrepresents the actual noise corridors present today).

167.    Plaintiffs' residents are included in the group of stakeholders whose health and safety must be considered and protected by Jefferson County if threatened by aeronautical operations at the Airport.

168.    The lead particulate deposits from piston-engine aircraft conducting touch-and-go operations on Runway 30R or Runway 30L create an unreasonable health and safety hazard for Plaintiffs' residents.

169.    Excessive and repetitive aircraft noise from piston-engine aircraft conducting touch-and-go operations on Runway 30R or Runway 30L create an unreasonable health and safety hazard for Plaintiffs' residents.

170.    Protecting the local community's health and safety is an adequate justification to impose a prohibition on an aeronautical activity at the Airport.

171.    As recognized by the FAA, EPA, and CDC, mitigating exposure to lead particulates is necessary to protect human health, especially children.

172.    Jefferson County refuses to mitigate or eliminate the harm and nuisance it is causing, despite the fact that it knows or has reason to know of the unreasonable negative impacts that the piston-engine aircraft touch-and-go operations have on Plaintiffs' residents.

173.    Jefferson County knows, or should know, the negative impacts of the piston-engine aircraft touch-and-go operations because the Town has notified Jefferson County of these negative impacts.

174.    Jefferson County knows, or should know, the negative impacts of lead particulates in piston-engine aircraft emissions.

175.    Jefferson County knows, or should know, the negative impacts of the piston-engine aircraft touch-and-go operations because the FAA and the National Academies have made it clear that "[t]here are no known safe lead exposures . . . [and] the GA sector continues to be a major source of lead emissions."

176.    Jefferson County knows, or should know, the negative effects of aviation noise on human health and welfare given myriad warnings raised by health researchers and national publications.

177.    Jefferson County knows, or should know, the negative effects of aviation noise, given that the Town has discussed this very issue with Jefferson County several times, and a Noise Roundtable was established at the Airport to try and ameliorate health impacts associated with aircraft noise.

178.    According to Jefferson County's former airport director, Jefferson County has not acted in good faith with the Noise Roundtable and has had no intention of doing anything to assist the Town or other affected communities.

179.    Despite Plaintiffs' expressed concerns about the impacts of the Airport, Jefferson County continues to try and expand the number of operations at the Airport, including the number of piston-engine aircraft operations.

180.    As a result of the foregoing public nuisance, Plaintiffs seek preliminary and permanent injunctions requiring Jefferson County to abate the continuing nuisance created by piston-engine aircraft performing touch-and-go operations at the Airport.

## CLAIM FOR INJUNCTIVE RELIEF
### (Public Nuisance)

181.    Plaintiffs incorporate all prior and other allegations of this Complaint as if fully set forth herein.

182.    Plaintiffs bring this suit to protect a public right and to prevent future potential injury to their residents and the public at large.

183.    Plaintiffs bring this suit to protect a public good, namely, safe and non-hazardous air and soil within their jurisdictions.

184.    Plaintiffs bring this suit to protect a public good, namely, their residents' ability to enjoy the quiet use of their homes and avoid negative health impacts caused by unreasonable exposure to aircraft noise.

185.    Jefferson County is causing a continuing public nuisance by not passing and enforcing an airport operating rule that prohibits touch-and-go operations by piston-engine aircraft using Runway 30R and Runway 30L.

186.    In the absence of an operating rule prohibiting touch-and-go operations by piston-engine aircraft using Runway 30R and Runway 30L, Jefferson County is directly causing and contributing to an unreasonable injury to Plaintiffs' residents caused by unlawful deposit of hazardous lead particulates in the Town and Boulder County.

187.    The deposit of hazardous lead particulates over the Town and Boulder County is causing or unnecessarily exposing Plaintiffs' residents to unreasonable health and safety risks, especially for the children who reside in or recreate in the Town.

188.    In the absence of an operating rule prohibiting touch-and-go operations by piston-engine aircraft using Runway 30R and Runway 30L, Jefferson County is directly causing and contributing to an unreasonable injury to Plaintiffs' residents caused by noise pollution that unreasonably harms Plaintiffs' residents.

189.    Jefferson County has the lawful authority to abate this nuisance.

190.    Jefferson County's decision not to prohibit touch-and-go operations by piston-engine aircraft that overfly Plaintiffs' residents constitutes a continuing public nuisance because such operations—which materially increase each year—unreasonably damage the safety, health, and welfare of Plaintiffs' residents.

191.    Jefferson County's decision not to prohibit touch-and-go operations by piston-engine aircraft that overfly Plaintiffs' residents constitutes a continuing public nuisance because such operations—which materially increase each year—are a substantial and unreasonable annoyance, inconvenience, interference, or injury to Plaintiffs' residents.

192.    Jefferson County's decision not to prohibit touch-and-go operations by piston-engine aircraft that overfly Plaintiffs' residents constitutes a continuing public nuisance because such operations—which materially increase each year—are an unlawful and unreasonable invasion of Plaintiffs' residents' interest in the use and enjoyment of Town property, Boulder County property, and their own property.

193.    Jefferson County's decision not to prohibit touch-and-go operations by piston-engine aircraft that overfly Plaintiffs' residents constitutes a continuing public nuisance because such operations—which materially increase each year—violate the Town's Municipal Code (*e.g.*, Code § 7-1-10).

194.    Jefferson County's decision to not prohibit touch-and-go operations by piston-engine aircraft that overfly Plaintiffs' residents constitutes a continuing public nuisance because piston-engine aircraft touch-and-go operations—which materially increase each year—unlawfully and unreasonably contaminate the surface, soil, and air and threatens the health, safety, and welfare of Plaintiffs' residents.

195.    Jefferson County's decision to not prohibit touch-and-go operations by piston-engine aircraft that overfly Plaintiffs' residents constitutes a continuing public nuisance because piston-engine aircraft touch-and-go operations—which materially increase each year—unlawfully and unreasonably expose Plaintiffs' residents to unreasonable noise pollution and threatens the health, safety, and welfare of Plaintiffs' residents.

196.    Jefferson County's decision to not prohibit touch-and-go operations by piston-engine aircraft that overfly Plaintiffs constitutes a continuing public nuisance because piston-engine aircraft operations, including touch-and-go operations, continue to increase at an unreasonable rate year-over-year.

197.    All of the above actions constitute an intentional, knowing, and substantial invasion of Plaintiffs' residents' interest in the use and enjoyment of their property.

198.    Plaintiffs are entitled to preliminary and permanent injunctive relief because there is no other remedy at law that will address this public nuisance and irreparable harm will result if injunctive relief is not granted.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    Grant a preliminary injunction requiring Jefferson County to abate the public nuisance caused by piston-engine aircraft performing "touch and go" operations on Runway 30L and Runway 30R at Rocky Mountain Metropolitan Airport; and

B.    Grant a permanent injunction requiring Jefferson County to abate the public nuisance caused by piston-engine aircraft performing "touch and go" operations on Runway 30L and Runway 30R at Rocky Mountain Metropolitan Airport.

## PLAINTIFFS DEMAND A JURY TRIAL PURSUANT TO C.R.C.P. 38

/

/

/

/

/

/

/

/

/

/

/

/

Respectfully submitted this 12th day of March 2024.

GREENBERG TRAURIG, LLP

*/s/ Andrew Barr*
Andrew Barr, #49644
Lindsay Aherne, #48391
John Wharton, #47776

*Attorneys for Plaintiffs*

Addresses for Plaintiffs:

Town of Superior
124 East Coal Creek Drive
Superior, Colorado 80027

Board of County Commissioners of the County of Boulder, Colorado
Commissioners' Office
Boulder County Courthouse, Third Floor
1325 Pearl St.
Boulder, CO 80302